**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

COLLIN TRELLY,

         *Plaintiff,*

  v.

MONROE COUNTY DEPUTY SHERIFF GEIGER,

         *Defendant.*

**DECLARATION OF**
**ADAM GEIGER**

Case No.:  13-cv-6248

**Pursuant to 28 U.S.C. §1746, Adam Geiger, declares as follows:**

  1.  I am a Monroe County Deputy Sheriff employed by Monroe County Sheriff Patrick M. O'Flynn.

  2.  I was hired by the Monroe County Sheriff in 2009.

  3.  I attended the Basic Course for Police Officers (the "Police Academy"), which was held at the Public Safety Training Center in Rochester, New York, and conducted by Monroe Community College.

  4.  On September 20, 2011, I was employed as a Jail Deputy and was assigned to, Third Platoon, 4 South Housing Unit.

  5.  A Jail Deputy is responsible for maintaining the safety and security of the Monroe County Jail, overseeing the care, custody, and well-being of inmates, and tending to inmates' daily personal needs.  This includes conducting periodic rounds to check inmate behavior, cleanliness of the facility, developing rapport with inmates to identify and resolve problems, mediate incidents, disturbances and complaints, and to determine the appropriate strategy to take and when a higher level of involvement is required.

1

6.      As such, on September 20, 2011, I was tasked with providing security and supervision for inmates housed within the Monroe County Jail, including the visual inspection of each individual inmate housing unit.  Attached as **Exhibit A** is a true and accurate copy of General Order 47-09 "Security and Supervision."

7.      While I was conducting my 22:30 watch tour round on September 20, 2011, I noticed a piece of paper covering Inmate Collin Trelly's cell light, which is an infractable offense.

8.      In order to comply with my job responsibilities, I am required to maintain uninterrupted personal visual observations of inmates.

9.      I cannot maintain uninterrupted visual observations of inmates when the cell light is covered, therefore, not allowing me to fully observe the cell.

10.      As such, upon noticing that Inmate Trelly's light was obstructed, I instructed him to remove the paper.

11.      Inmate Trelly became verbally abusive, got up, and removed the paper.

12.      Satisfied that Inmate Trelly removed the paper and that I was able to maintain an uninterrupted observation of his cell, I completed my tour.

13.      Later that night, while completing a relief tour with Deputy Fleming, I noticed Inmate Trelly's light was again obstructed by paper.

14.      For a second time, I instructed Inmate Trelly to remove the paper from the cell light.

15.      Inmate Trelly again became verbally abusive; however, after instructing him to remove the paper from the light several more times, he complied.

16.      As I began to walk away, Inmate Trelly said "suck my dick cocksucker."

2

17.     At that point, I entered Inmate Trelly's cell to counsel him for failing to follow the rules and regulations of the jail, including my repeated orders not to cover his cell light.

18.     I proceeded to exit Inmate Trelly's cell and continued the tour before the end of my shift.

19.     I never placed my hands on Inmate Trelly or had any physical contact with Inmate Trelly on September 20, 2011.

20.     I did not know Inmate Trelly prior to my interaction with him on September 20, 2011.

21.     General Order 58-J-09 requires that an Incident Report shall be used by the Jail Bureau to record and document any circumstances surrounding incidents of a non-criminal nature that a Deputy feels requires complete documentation.  Attached as **Exhibit B** is a true and accurate copy of General Order 58-J-09.

22.     On numerous occasions I have counseled inmates regarding the rules and regulations of the jail.

23.     In my experience, this incident did not rise to the level of needing an Incident Report.  Instead, I made a notation in the log regarding the incident.  Attached as **Exhibit C** is a true and accurate copy of my log notation.

24.     Had physical contact been made with Inmate Trelly, I would have completed an Incident Report and immediately contacted my supervisor.

25.     Furthermore, the Monroe County Sheriff's Office conducted an Internal Affairs Investigation into this incident and determined that Inmate Trelly's allegation of use of force was unfounded and that I did not violate any Monroe County Sheriff's Office policy or procedures.

**I declare under penalty of perjury that the foregoing is true and correct.**

*Executed on July 14, 2017*

*s/ Adam Geiger*

_____

**Adam Geiger**

# Exhibit A

### COUNTY OF MONROE
### OFFICE OF THE SHERIFF
#### ROCHESTER, NEW YORK

| General Order | Date of Issue | Effective Date | No. |
|---|---|---|---|
| Jail Bureau | February 11, 2009 | February 11, 2009 | 47-09 |

| Subject:  General Order | Distribution | Amends |
|---|---|---|
| Security and Supervision | Jail Bureau Personnel | |

| REFERENCE: Section 7003.3 (j)(3)&(4) of the New York State Commission of Corrections Minimum Standards, NYSSA 37, 38, 70, 130. | Rescinds<br>JBGO 47-03<br>JBB 12-08<br>JBB 18-08 |
|---|---|

**Purpose:** To establish policies and procedures designed to ensure and maintain facility safety, security, and supervision for inmates housed within the Monroe County Jail (MCJ) and the Monroe Correctional Facility (MCF).

**Policy:** It is the policy of the Monroe County Sheriff's Office to provide security and supervision in accordance with Part 7003 of Title 9 of the Official Compilation of Codes, Rules and Regulations of the State of New York (9NYCRR Part 7003).

I.   **Definitions**

  A.   **Supervisory Visit:**  The personal visual observation of each individual inmate by staff members responsible for the care and custody of the inmate(s) so as to monitor their presence and proper conduct.  A personal, visual inspection of each individual inmate housing unit and the area immediately surrounding such housing unit by staff members responsible for the care and custody of inmates to ensure the safety, security, and good order of the facility.

  B.   **General Supervision:**  The accessibility to inmates of staff members responsible for the care and custody of such inmates to include conducting of supervisory visits at 30-minute intervals.  General supervision will be maintained in all facility housing areas when all inmates are confined to his/her individual housing units.

  C.   **Active Supervision:**  The accessibility to inmates of staff members responsible for the care and custody of such inmates to include:

   1.   The uninterrupted ability to communicate orally with and respond to each inmate unaided by any electronic or other amplifying device.

   2.   The conducting of supervisory visits at 30-minute intervals.

   3.   The ability of staff to immediately respond to emergency situations.

   4.   The continuous occupation of a security post in any housing area in which more than 20 inmates are housed.

D.     **Constant Supervision:** Will mean the uninterrupted personal visual observation of inmates by staff members responsible for the care and custody of such inmates without the aid of any electrical or mechanical surveillance devices. Staff members will provide continuous and direct supervision by permanently occupying an established post in close proximity to the inmates under supervision which will provide staff with:

1.     A continuous clear view of all inmates under such supervision.

2.     The ability to immediately and directly intervene in response to situations or behaviors observed which threaten the health or safety of inmates or the good order of the facility.

II.     **Reporting to Shift/Assigned Areas of Duty**

A.     Staff members will report to roll call in accordance with **MBGO-27, Attendance, Tardiness and Absenteeism.**

B.     Staff members will not be permitted to bring any personal carry bags into security, such as brief cases, personal folders, purses, duffel bags, back packs or any other bag carrying personal items.

   **EXCEPTION:**   Staff assigned to MCJ and MCF will be permitted however, to store all lunch/dinner items within staff locker rooms or in available refrigerators in security, away from housing areas until they are relieved for the meal. Staff will not be permitted to take their lunch/dinner or any food items to their assigned area of duty.

C.     Staff members reporting to their area of assignment will, prior to assuming responsibilities, complete the following:

1.     Obtain and inspect all necessary keys for the assigned area.

2.     Inspect all supplies, equipment, locks, gates, bars, security screens, security windows, and other securing devices. Any equipment found missing, damaged, or altered in any way will be reported to the duty Sergeant/shift supervisor immediately.

3.     Conduct a debriefing regarding the previous shift, tour the housing area, to include an **inmate physical headcount**, with the staff member being relieved. The staff member completing his/her regularly scheduled shift will place the results of the inmate physical headcount in the log.

4.     As soon as possible, review all written and/or computerized records maintained in the area of assignment. Upon review, list all assigned equipment, and the condition of the housing area in the housing area log. All reviews, whether in a bound ledger or a computerized log, will contain the date and the employee's name and IBM #.

III.     **Logbook and Computerized Logging Procedures**

A.     New logbooks will be opened by assigned staff members, who will identify on the inside front cover of the logbook, the date and time the logbook was opened, the location of the logbook and the signature/IBM # of the staff member opening the logbook.

B.  All written records pertaining to facility housing supervision will be recorded in black ink in a bound ledger of consecutively numbered pages. Records will include, but not be limited to, the following:

   1.  The name of the housing area in which the supervision is being maintained.

   2.  The date and time of the supervision.

   3.  The type of supervision being conducted; this must be logged at the start and conclusion of each shift - whether it is **General Supervision, Active Supervision,** or **Constant Supervision.** Anytime the level of supervision changes, a log entry must be made documenting that change.

   4.  The condition of the area being supervised.

   5.  The name/IBM # of the staff member conducting the supervision.

C.  Operations and Activity Logs

   1.  All Black Creek and JMS systems will be disabled before staff leaves his/her terminal.

      a.  At no time will any user operate Black Creek or JMS systems under another staff member's sign on.

      b.  Interlock override is strictly for emergency purposes only and is not to be used as regular operating procedure to expedite the opening of a door.

   2.  All housing areas will maintain floor activity log entries that will contain information relevant to the security, care, and custody of inmates assigned to each housing area. Entries on JMS will be specific and include, but not be limited to, routine and emergency information, the type of supervision being conducted (reference **Section III, subsection B** of this order), staff action(s), reportable incidents, and staff to staff communications.

   3.  All log entries are to be brief and accurate.

   4.  If JMS is down, bound paper logbooks will be instituted. All entries will be preceded by the date and time, and concluded with the staff member's signature/IBM #. Entries will not be altered or deleted for any reason either in JMS or hand written notations. Staff may only correct a handwritten entry by drawing a single straight line through the section containing the error, and will place their initials and IBM # adjacent to the correction. In accordance with **9NYCRR Part 7003.3,** if alterations to entries must be made of a computerized log entry, it will require staff to make an additional entry. Entries on a computerized log will not be deleted.

   5.  The duty Sergeant/shift supervisor will review the housing area log and **tour all housing/work areas at least once during each shift daily,** and note the review/tour in the housing area log.

D.   Operations Status Board - Floor Status

Housing area floor status will also be maintained on JMS and will be used to account for all inmates exiting housing areas for any reason. The Floor Status will be changed to reflect the destination of each inmate exiting the housing area. Upon return to the housing area, an inmate's Floor Status will be changed to "IN" or other appropriate status.

E.   Supervisory Tour Logbooks

Supervisory tour logbooks (catwalk tour logbooks) will be maintained in all housing areas. Supervisory visits conducted in the course of providing active or general supervision will be entered in the housing area tour logbook at the time such visits (tours) are conducted. Tour logbooks will not be kept on JMS, and will be contained in a bound ledger.

F.   All logbooks, computerized logs, and Black Creek systems will be secured when not in use.

G.   Staff will close out all completed logbooks by identifying after the last entry in the logbook, the date and time the logbook was completed and the signature/IBM # of the staff member closing the logbook. Completed logbooks will be retained in the housing area, in a secure location, for at least three (3) weeks before being forwarded to archives for storage in accordance with **JBGO-25, Facility Record Retention System.**

IV.   **Inmate Supervision**

Supervisory tours will be conducted to maintain the safety, security, and good order of both MCJ and MCF. Staff conducting supervisory tours will exercise proper vigilance while performing their duty, paying special attention to the presence of contraband, building maintenance problems, inmate's well being, attitudes, and overall housekeeping. Supervisory tours will include, but are not limited to, the security inspection of bathrooms, interview rooms, and storage closets.

All inmates will be restricted to their cell/bunk between 2200 hours and 0700 hours. Staff will not authorize inmates to leave their cell/bunk during the aforementioned time frame except in case of emergency, inmate work programs/assignments, release, or evacuation. In dormitory style housing areas, staff may authorize an inmate to use the restroom facilities or receive prescribed medication(s).

A.   Supervisory Tours will include conducting of supervisory visits throughout all housing areas at both the Monroe County Jail and the Monroe Correctional Facility.

1.   Active supervision will be maintained from 0700 hours to 2200 hours. General supervision will be maintained between 2200 hours and 0700 hours. All shifts will utilize the time recording system (key punch or annunciator when applicable) to record each supervisory visit in addition to placing an entry in the bound tour logbook. Supervisory visits (tours) will be conducted at 30-minute intervals.

2.   The following areas will conduct supervisory tours at 15-minute intervals, during all above time frames: Central Booking, Reception, the Special Housing Unit, and the 200 Unit at MCF. As aforementioned, all shifts will utilize the time recording system (key punch or annunciator when applicable) to record each supervisory visit in addition to placing an entry in the bound tour logbook.

3. Sergeants and shift supervisors will review the tour entries in the bound tour logbook for each area while conducting supervisory tours. Any discrepancies will be addressed immediately.

4. Electronic key punch and annunciator watch tour records will be reviewed by command staff. Platoon Lieutenants will review records from each housing area at a minimum of once per week. Any discrepancies will be addressed immediately.

B. The Superintendent or designee (i.e. highest ranking staff member on duty) and/or the Contract Medical Provider may determine that an inmate requires additional supervision based on the inmate's condition, illness, or injury. Additional supervision may include:

1. More frequent supervisory visits.

2. Active supervision when only general supervision is required.

3. Constant supervision.

C. If an inmate is placed on constant supervision it will be documented on an **Incident Report (JB-136 Incident Report-Jail Bureau)** and the shift supervisor will be notified. Whenever circumstances require authorized staff to make short term supervision enhancements, a subsequent authorization to continue the increased supervision by the Superintendent and/or facility physician, as well as the final authorization of the Superintendent, will be recorded in the inmate's medical file and the housing staff will be notified accordingly.

D. Determinations or orders given requiring additional supervision in accordance with this section, as well as those outlined in **JBGO-31 Mental Health Protocols** pertaining to constant supervision, will be documented in the housing area logbook and will include, but not be limited to the following:

1. The name(s) of the person(s) ordering additional supervision.

2. The specific facts and reasons underlying the determination.

3. The date(s) and time(s) the supervision is to begin and end.

4. The name/IBM # of staff member conducting the supervision.

5. The staff member's observations of the inmate's condition or behavior.

6. The date(s) and time(s) the supervision was actually initiated and terminated.

E. Active supervision will be maintained for inmates participating in activities outside facility housing areas, however, the Chief Administrative Officer may determine that supervision, other than active supervision, is required where appropriate, to include, but not be limited to the following:

1. Constant supervision.

2.    Supervision by:

    a.    Facility staff members primarily responsible for duties other than the care and custody of prisoners (i.e. food services staff).

    b.    Other persons providing services within the facility, including persons conducting facility programs (i.e. rehabilitation staff).

3.    Inmates participating in temporary release programs as provided in **New York State Correction Law** need not be supervised when such inmates are outside the confines of the facility.

4.    The Chief Administrative Officer will determine the type and manner of supervision to be provided to trustees while such trustees are outside their facility housing areas. Active supervision will be the rule, with general supervision maintained, at a minimum.

## V.    Inmate Population/Emergency Counts

A.    Inmate population head-counts will consist of **physical body counts and will be conducted at each shift change in the transitional period from 0645 to 0700 hours, 1445 to 1500 hours, and 2245 to 2300 hours.** Staff members conducting a physical headcount will restrict all inmates to their cell/bunk until the count is completed and verified. Inmates who are not physically present in the housing area at the time of the headcount will be accounted for and verified by location in the housing area activity log. **Discrepancies regarding physical headcount(s) will be reported to the housing area supervisor, (at MCJ), or the facility supervisor, (at MCF), immediately. Jail Records and the Chief Administrative Officer will also be notified when there is a discrepancy during the count.**

B.    The staff member completing each regularly scheduled shift and the staff member beginning each regularly scheduled shift will conduct inmate population counts at all scheduled shift changes and will account for all inmates assigned to the housing area. Staff members completing each regularly scheduled shift will enter the results of all physical head-counts in the housing area activity log in the JMS computer system under the drop down **HEADCOUNT (UNIT),** which will include the following:

1.    The facility area in which the count was conducted in the "**Flr**" field.

2.    The actual date and time of the count in the "**Activity Dt/Tm**" field.

3.    The total number of inmates accounted for in the "**Count**" field.

4.    The number of inmates accounted for and location breakdown by cellblock or area defined in the Operations Status Board in the "**Notes**" field.

5.    The last names/IBM # of each staff member conducting the count in the "**Description**" field.

C.    **In addition to the shift change counts, a staff member assigned to each housing area will conduct an inmate population count at 1800 hours daily.** This count will be documented according to the informational requirements outlined above in **Section V, subsection B** of this order.

D.    The staff member beginning each regularly scheduled shift will report the results of each physical inmate population head-count to the housing area supervisor. Housing supervisors will verify that all physical head-counts are properly logged and recorded in the housing area logs.

E.    The Jail Records Office will be designated by the Superintendent to verify and report Inmate Population Counts by compiling a **Daily Population Shift Headcount Report** and forwarding these to the Chief Administrative Officer for signature utilizing the following procedure:

    1.    Under the Operations Logging Activities menu, in the JMS computer system, retrieve all **HEADCOUNT (UNIT)** floor activity notes entered by housing unit staff during each scheduled physical head count.

    2.    Verify each physical head count utilizing the Operations Facility Count screen. The count for each area in the **"Supv Count"** field will be entered in addition to entering the last name and IBM # in the **"Supervisor Comments"** field for each member conducting the count.

    3.    Jail Records staff will initiate an investigation immediately when any discrepancies are discovered during the count verification process.

F.    Staff will conduct an emergency population count any time it is necessary to verify the identity and location of an inmate(s), civilian(s), and/or staff. In addition, emergency counts will be conducted any time inmates have been evacuated from a housing area due to an emergency situation within the Jail/Correctional Facility, in accordance with **EMGO-117 Evacuation Procedures**.

G.    Staff members supervising work details within or outside MCJ or MCF will conduct population counts at irregular intervals throughout the work detail. Any physical headcount discrepancy will require the supervising staff member to notify the duty Sergeant/shift supervisor immediately.

## VI.    Inmate Movement and Control

A.    Inmate movement within MCJ and MCF will be governed by the classification status of the inmate being moved. All inmate movement will be controlled and supervised by staff.

B.    Minimum security inmates residing at MCF will be permitted to move by themselves within the facility hallway to attend programs or activities provided they have been issued a "Prisoner Pass" by their housing area supervisor. Assigned "hallway staff" will ensure that inmates walk through hallways in a quiet and orderly manner. Inmates involved in any disturbance or incident within MCF will require staff to escort that inmate to and from any program or activity.

C.    Inmates will be handcuffed behind the back and escorted by at least two staff members during any relocation within the facility that involves a violation of Jail/Correctional facility rules and regulations that involves physical injury to a staff member, civilian, or inmate. In addition, this rule will also include inmates who **attempt** to cause physical injury toward a staff member, civilian, or inmate, or any attempt of escape or other serious violation of Jail/Correctional facility rules and regulations. Any further inmate restraint and/or control will be conducted in accordance with **JBGO-42 Inmate Movement/Restraint Procedure, JBGO-20 Quick Entry Team**, and **MBGO-05 Use of Restraining Devices**.

VII.    **Key Control**

A.    All security keys will be maintained, stored, and secured in Central Control. Central Control staff will be responsible for accountability of all security key sets. Key sets that cannot be accounted for will be reported to the duty Sergeant/shift supervisor immediately.

B.    Staff members requesting a security key set must surrender their issued key card or their department identification card to Central Control staff. Central Control staff will place the key card/department identification card on the key sets assigned hook. In addition, Central Control staff will log the key set "out" on the **JB-23, Key Control Sheet**, which is maintained in Central Control, identifying:

   1.    The key set designation, which is located on a circular disk attached to the key set.

   2.    The receiving staff member's name/IBM #.

   3.    The time the keys were issued.

C.    Key sets that remain within assigned housing areas will be exchanged between staff members within the housing area. However, the relieving staff member will surrender their key card/department identification card to Central Control staff prior to reporting to the area of assignment.

D.    Staff members relieved of duty during their assigned shift will surrender their key set to the relieving staff member. Outgoing staff will return all non-essential key sets to Central Control upon completion of their tour of duty.

E.    Swipe cards are utilized throughout various parts of the Monroe County Jail and are issued to all sworn staff members and designated civilian personnel assigned to the Monroe County Jail. These cards are uniquely coded and serve as an identifier for that specific individual.

   1.    Swipe cards will be turned in upon resignation, termination, or at the order of Command Staff. Said cards will be surrendered to the highest ranking Command Officer on duty and forwarded to Jail Administration.

   2.    Additional swipe cards kept in Central Control for use by civilian personnel (i.e. Contract Medical Provider) are to be signed out in accordance with **Section VII, subsection B** of this order.

      **Note:**    Lost or stolen swipe cards must be reported to a supervisor immediately so that the card can be deactivated.

F.    Staff will not allow inmates to possess security keys/swipe cards for any reason whatsoever. Security staff will maintain assigned keys/cards on their person at all times throughout their tour of duty.

G.    Security keys will not be taken outside of the secured area of the Jail/Correctional facility without the approval of a duty Sergeant/shift supervisor.

H.   Emergency key sets and additional swipe cards for emergency evacuation purposes will be maintained, stored, and secured within Central Control and will not be issued to staff members without prior approval from a duty Sergeant/shift supervisor. Emergency key sets which access doors leading to outer limits of the secured confines of either MCJ or MCF will only be issued to a Command Staff member.

I.   Staff will inspect key sets/swipe cards and ensure that they are in proper working order. Any key(s)/card(s) found damaged, missing, or altered in any way will be reported to the duty Sergeant/shift supervisor immediately.

J.   All keys and key sets will be inventoried and accounted for on a Master Key Inventory bi-annually by a staff member designated by the Administrative Lieutenant. The completed Key Inventory will be submitted to the Administrative Lieutenant.

K.   Staff requesting a replacement key or swipe card will complete and forward a **Special Report (MB-003)** along with **MB-069 Key Authorization** form to Jail Administration, for review and authorization.

VIII.   **Firearms Control**

A.   Firearms, ammunition, unauthorized weapons of any kind, or unauthorized handcuff keys are strictly prohibited from being introduced into either MCJ or MCF. All firearms and ammunition will be controlled in accordance with **9NYCRR Part 7003** and **JBGO-11 Weapon Locker Control**. A certified firearms instructor will conduct an inspection of all MCJ/MCF firearms and ammunition at least once every 6 months. A written record of such inspections will be maintained and will include:

   1.   The name of the person conducting the inspection.

   2.   The date of inspection.

   3.   The type of and quantity of firearms or ammunitions.

   4.   Any other information relative to the condition of the firearms or ammunition.

B.   Upon assignment to a detail that requires a firearms qualified staff member to carry a firearm, the member will gain approval from the duty Sergeant prior to being issued a firearm by the Booking supervisor. Firearms and ammunition will be issued to staff in accordance with **JBGO-11 Weapon Locker Control**.

C.   In accordance with **9NYCRR Part 7003.8**, facility firearms and/or ammunition will be issued only upon the determination of the Chief Administrative Officer. Such determination will be in writing and will include the following:

   1.   Specific facts and reasons underlying the determination.

   2.   Date and time of issuance and return of any firearms or ammunition.

   3.   Type and serial number of firearms or ammunition issued.

   4.   Name of the staff member issued the firearms or ammunition.

D.  Firearms or ammunition will be issued only to staff members trained in the use of such equipment by a certified firearms instructor.

E.  Only departmentally approved and issued weapons and service ammunition may be carried while on duty, in accordance with **MBGO-15 Firearms/Deadly Physical Force.**

F.  The storage, inspection, issuance, and administration of chemical agents will be in accordance with the provisions of **JBGO-49 Aerosol Subject Restraint, MBGO-12 Less-Lethal Weapons,** and **9NYCRR Part 7063.**

## IX.  Gifts and Gratuities

Staff will not be permitted to trade or barter with any inmate housed within MCJ or MCF. In addition, staff will not be permitted to receive or to give any item whatsoever, or buy from or sell anything to any inmate, or extend to an inmate any favor of diet, clothing, or any other item not common to all inmates.

## X.  Portable Radio(s), Handcuffs, and Oleoresin Capsicum (OC)

Staff will ensure that they keep all issued equipment on their person at all times. In accordance with **MBGO-26 Uniforms and Equipment**, staff members assigned to the Jail Bureau will be responsible for their assigned portable radios, handcuffs, OC, and any other equipment as it was originally issued. As stated in **Section I, subsection B** of this order, members and employees will be responsible for lost, stolen, misplaced, altered, or damaged items. In addition, if such loss is attributed to employee neglect or carelessness, such members and employees may be subject to disciplinary action. Any equipment that needs to be replaced for any reason due to damage, excessive wear, loss, or theft will be documented on a **Special Report** with the necessary replacement form pursuant to **MBGO-26** and immediately reported to a supervisor. A copy of said report will be forwarded to Jail Administration.

By Order of the Sheriff,

Patrick M. O'Flynn

Patrick M. O'Flynn

\*.    Indicates significant changes from the previous order.

# Exhibit B

## COUNTY OF MONROE
## OFFICE OF THE SHERIFF
### ROCHESTER, NEW YORK

| GENERAL ORDER JAIL BUREAU | DATE OF ISSUE March 19, 2009 | EFFECTIVE DATE March 19, 2009 | NO. *58-J-09 |
|---|---|---|---|
| SUBJECT: GENERAL ORDER Incident Report | | DISTRIBUTION Jail Personnel | AMENDS |
| REFERENCE: | | | RESCINDS MBGO 11-99 |

**Purpose:** To establish policy and procedures for the use and completion of the **Incident Report (JB-136)** for Jail Bureau members.

**Policy:** The Incident Report will be used by the Jail Bureau to record and document any circumstances surrounding incidents of a non-criminal nature.

I. **General**

The Incident Report will be used for the following types of situations, (reference **JBGO-52 Reportable Incidents, JBGO-43 Incident Command System for Jail Operations,** and **JBGO-31 Mental Health Protocols**):

A. Fires.

B. Deaths.

C. Suicides and suicide attempts.

D. Motor vehicle accidents involving Department vehicles (i.e. a Jail Transport car) or damage sustained to Department vehicles sustained in any other way.

   **Note:** This is in addition to any other reports which may be required by other law enforcement or police agencies. (i.e. Report of Motor Vehicle Accident Report Form/MV-104, Fleet Damage Report.)

E. All jail-related incidents and situations involving staff/civilian/inmate injuries, inmate infractions, or any of the following:

   - Fights.
   - Hostage situations.
   - Escape/escape attempts.
   - Contraband.
   - Disturbances.
   - Maintenance/Service problems or disruptions.
   - Property damage.

F. Incidents which require ambulance or fire department response or whenever **Incident Command** is used.

G. Whenever an inmate is placed on Constant Supervision.

H. **Any situation that the Deputy or supervisor feels requires complete documentation.**

Note:    In any instance where criminal charges may apply, the appropriate agencies will be notified for investigation.  Reference **JBGO 54-08 Criminal Investigations of Incidents Occurring in Jail Facilities.**

## II.    Form Preparation

Page 1 of ___ at the bottom right of the form indicates the total number of pages that are included for the initial report.  An **Addendum Report (JB-300)** will be utilized as a continuation page of the Incident Report when needed.

Block 1:      **Incident Type:** *Drop down box.* Select which description is most accurate to the incident being reported.

Block 2:      **Classification (Supervisory Review):** If the supervisor agrees with the original classification, this box will contain only the supervisor's signature.  If the supervisor disagrees, he/she will strike out the classification in Block 1, enter the proper classification, and initial the re-classification.

Block 3:      **CR # (3a) and IMS # (3b):** This is the CR number and/or IMS number assigned to the incident.  The IMS number will be generated for all reportable incidents according to current procedures.  Should the incident also be of a criminal nature, both the CR and IMS numbers will be listed.

Block 4:      **Time of Occurrence:** All dates will be entered as double digits (i.e. 02/25/09) and all time will be recorded in military time (i.e. 10:35 pm is entered as 2235).

Block 5:      **When Reported:** Month/day/year and the time the incident was reported to a supervisor.

Block 6:      **Response Code:** *Drop down box.* Enter appropriate "Code" if a Code was called/used.

Block 7:      **Location (7a):** The housing area or jail location where the incident occurred, i.e. 3MW25, 3 North Minors common area, Plaza Mezz Towers connecting hallway, 600 Unit, 4th floor Hall of Justice, etc.  **Facility (7b):** *Drop down box.* Select area/facility where the incident occurred.

Block 8:      **Persons Involved:** Enter Name, Sex, Race (*drop down box*), Date of Birth (DOB), Jail Housing Location/Assignment, their MCJ ID/MoRIS #, their Classification (drop down box) -- i.e. Sentenced, Federal, etc, and Code (*drop down box*) of **each** person involved in the incident.  Code refers to the subjects nature of involvement, i.e. was the "victim", was the "major" (main subject/initiated the incident), "minor" (was less involved in incident/not the subject, etc).

Block 9:      **Were there injuries resulting from this incident?:** Check any and all boxes that are applicable.

Block 10:     **Evaluated (Location) (10a):** *Drop down box.* Mark appropriate location of where the subject (if injured) was medically treated.  **When Evaluated (10b):** The date and time medical treatment was provided.

Block 11:     **Narrative:** Use this block to describe details of the incident.  If the narrative expands on information from a prior block, then place the appropriate number of that block in the shaded margin.  Then, adjacent to that number, continue with the information.  When ready to start the narrative body of the report, place 11 in the shaded margin and then write the report in the space provided.

Block 12:     **MCSO Tech Work (IBM)**: Check the appropriate box that indicates whether a Technician was required/used and their IBM #.

Block 13:     **Jail Tech Work (IBM)**: This applies if photograph(s) were taken by jail personnel. If so, check the "Photos by" box and indicate the IBM # of the member who took the photograph(s). If property/evidence was collected, check the appropriate box and indicate the IBM # of the member who collected it.

Block 14:     **Reporting Officer** (14a): Type reporting officer name and IBM #. The signature of the reporting officer is provided in (14b).

Block 15:     **Assisting Staff**: Enter the name(s) and IBM # of any staff member who provided assistance.

Block 16:     **Supervisor Notified**: Name of the immediate supervisor that was notified.

Block 17:     **Supervisor Approving**: Signature of the approving supervisor, their IBM #, and the date the report was approved/signed.

Block 18:     **Platoon Commander Review**: Signature of the approving Platoon Commander, their IBM #, and the date the report was approved/signed.

Block 19:     **Security Action Taken:** Is to be used by supervisors to document any and all further action that was taken in regard to the reported incident. Any and all applicable boxes will be checked. Appropriate documentation will be attached as required.

Block 20:     **For Administrative Use Only (Administrative Review)**: Signature, rank/title, and IBM # of the Administrative Supervisor reviewing/approving the report and the date.

Block 21:     **For Administrative Use Only (Action Taken)**: Referral of the incident for follow-up as applicable. To be completed by the Administrative Supervisor reviewing/approving the report.

III.   **Distribution/Maintenance and Review of Incident Reports**

A.     Supervisory personnel will review and approve the report(s) and forward copies to all applicable and prescribed areas.

B.     Copies of all completed reports and supplementary information pertaining to reportable incidents will be maintained on file in Jail Administration.

C.     The Superintendent and/or designated staff will review, on a regular basis, all reports resulting from the review and/or investigation of reportable incidents in accordance with current procedures.

By Order of the Sheriff,

*Patrick M. O'Flynn*
Patrick M. O'Flynn

\*   Indicates significant changes from the previous Order.

# Exhibit C



